## EXHIBIT A

COMES NOW the Plaintiff, Rafael Moises Suarez, first being duly sworn under oath in the instant matter, herein declare and depose that the above named Respondents/Defendants did knowingly and willfully act and conspire to oppress, injure and damage this Complainant Affiant as herein below set forth, and by evidences set forth in the attached complaint.

1. On or about AUGUST 17, 1997 the Affiant, Rafael Moises Suarez, was wrongfully charged by indictment IN THE SUPERIOR COURT IN AND FOR THE COUNTY OF COCHISE NO. 97000043 (B) PURSUANT TO AN UNLAWFUL ARREST with two counts Aggravated Assault and one Count of Armed robbery, occurring on or about December 14, 1996.

2. These charges arose from an incident in which I attempted to stop a fight between two other men but was later charged with assault. Cochise County prosecutors pursued a criminal action against me even though evidence from a 911 call, where the fight was initially reported to law enforcement, confirmed that the fight did not involve me as a participant but rather a Good Samaritan attempting to stop the fight.

3. Additionally, my defense attorney, Edgar Distel, failed to present this 911 tape or to call witnesses who could have accurately described my role in the incident. I was eventually convicted of one count of aggravated assault.

4. In July 2000, after spending almost three full years in Cimarron Medium-High Security Prison, my remaining sentence term was vacated by the Cochise County Superior Court following a lawsuit for ineffective assistance of counsel. I was released from prison. Upon being presented with evidence of what actually had happened, particularly the 911 transcript, Cochise County prosecutors agreed I committed no crime and declined to re-institute charges against me.

5. After my release, I instituted a civil action against my defense attorney, Edgar Distel, for legal malpractice regarding his failure to call two crucial eyewitnesses at trial. A Pima County Superior Court Judge awarded me a default judgment and $1,045,500 in damages when attorney Distel failed to appear in his own defense. However, I have been unable to collect any of this judgment because he did not carry legal malpractice insurance (as the state did not require him by law to do so) and ever since, he has continuously avoided satisfying the judgment against him.

6. On February 7, 1997 both Raymundo Morin and I, Rafael M. Suarez, were indicted and charged with two counts of Aggravated Assault and one count of Armed Robbery. These charges stemmed from an incident that occurred in December of 1996 involving Morin and Jack Lara Garey. It was alleged that Morin and I beat Garey and then took his property while visiting the home of Nerih Kiderav Morin and Juan Alverado.

7. The Aggravated Assault charges, both Class Three Felonies, were alleged to have occurred first with an iron bar and second with a knife. The Armed Robbery was alleged to have occurred with the same offenses. The accuser Jack Lara Garey, related to detective Jerald Lara (deceased) at all times relevant was good friends of the accused defendants. A Co-defendant, Raymundo Morin, was also charged with the same offenses.

8. On or about MARCH 17, 1997 I, hired Edgar G. Distel, as my attorney.

9. In early June of 1997, Distel began fervently attempting to withdraw as my attorney because he claimed he was not being paid.

10. On May 5, 1997, three weeks before trial, Distel moved to continue the trial date because he had a "previous commitment out of state".

11. On May 12, 1997 the court continued the trial and reset it for June 24, 1997. The trial was subsequently continued to July 1, 1997. Thus, more than enough time to appoint new counsel to prepare for my defense.

12. On June 9, 1997, less than a month before trial, Distel filed a Motion to Withdraw. In that motion, Distel acknowledged that "more and further investigation and legal work" needed to be done on the case and that his continued representation would constitute misrepresentation and legal malpractice (citations omitted) and deny my right to a fair trial.

13. On July 7, 1997, Distel again moved to withdraw because, alleged, he was not being paid. Again, the court denied his MOTION to WITHDRAW and determined it was in my best interest to keep "DISTEL" as my lawyer and did not allow him to withdraw. Thus,

over-stepping the legal circle and denied my right to have competent counsel in all critical stages of the case and denied my right to a fair trial.

14. On June 23, 1997, Distel filed a Motion for Funds asking the court for monies to "procure" the trial transcripts of the trial of (Morin), and for deposition of witnesses, and for the assistance of investigators and expert witnesses.

15. On July 22, 1997 the court denied the Motion For Funds but expressed its willingness to order the County to pay for any necessary investigation to prepare for my defense if there were some showing of my indigence. "Distel's numerous attempts to withdraw because he was not being paid is "showing" of my indigence." In addition, he never ordered the Cochise County Attorney's Office to disclose the trial transcripts of Morin's separate trial.

16. After Judge BOROWIEC denied motion for funds, denied my right to Due Process, i.e., trial transcripts of (Morin's) separate trial that were never produced by Prosecutor Chris Roll, Cochise County Attorney's office upon request.

17. That had detective MICHAEL BROCK, detective JERALD LARA, detective VINCE MADRID, and detective GREGORY FLOYD, had conducted appropriate investigations in the matter they would of quickly realized that I was "TOTALLY INNOCENT" OF WRONG DOINGS AND WOULD OF NEVER BEEN ARRESTED.

18. From the beginning this was described as a fight between two people- Raymundo Morin and Jack Garey. The transcripts of the 911 call made by Nerih Morin, make it clear she was calling about a flight between her brother, Raymundo Morin and Jack Garey. At no point does she indicate that I, Rafael Suarez, was involved in the altercation.

19. Plaintiffs attorney Edgar Distel, reluctantly interviewed deputy Gregory Floyd, Sheriffs Department-Sierra Vista, responded to a call from his dispatch, called and went straight to hospital, spoke with a paramedic and spent 1 and 1/2 hours with Jack. Detective "Jerry Lara" is a family member of Jack. He arrived at the Circle K store located in Huachuca City approximately 20-30 minutes prior to detective Mike Brock Sheriffs department-Sierra Vista. The Circle K clerk, Ferman Anderson, called police because he noticed Jack was in pain and was talking with him before police arrived. Jack told him that he had left his girlfriend at a bar, and that he got into a fight between three men, not two, and allegedly he got in a few good licks into them. Jack did not complain about being robbed or jumped by anyone. The clerk also said that Jack still had his wallet. The Circle K store clerk was talking to Jack before police arrived. All Jack talked about was his girlfriend. (Jack's speech was not slurred). Det. Lara picked-up the car and told the Circle K store clerk, a family member would be paying for Jack's hospital bill. The Circle K store clerk, Ferman Anderson, was called by Prosecutor Chris Roll to testify at Morin's trial, but he did not call upon him to testify at my trial. Probably because Chris Roll learned of information beneficial to my defense gathered from the mistrial of co-defendants separate trial which he knew would destroy his case against me as for reasons of not calling him to testify.

20. On cross-examination and through the testimony of the investigating detective Vince Madrid, it was established that Jack Lara Garey originally told police several things inconsistent with his trial testimony. For example, he told detectives that the passenger, not the driver, had hit him and that his assailant had a tattoo on his right hand. He also stated that it was the passenger who took his ring and threatened him with the knife.

Additionally, when speaking with the detective, he only described one attacker not two, on the swing that broke his arm and hit him in the head.

21. In his original statement to the police and at Morin's trial, Jack testified that the driver of the vehicle had green eyes and blond hair.

22. Jack told Guadalupe that he had been beaten up by Raymundo. In fact, he never said that I beat him up.

23. Additionally, Raymundo told Guadalupe, "Thanks to Rafael, that he did not kill him. Raymundo also disputed the manner in which Jack suffered his injuries. He testified that he and Jack got underneath the car to try to put the muffler back and were unable to fix the car. He got frustrated over it and then started arguing with Jack over the issue which had arisen over his girlfriend earlier.

24. Raymundo pushed Jack two times in the chest. Jack picked up a rebar and swung it at him approximately two times. In response, Raymundo took out his knife and poked Jack with it a few times. Then "THEY" began to wrestle for the rebar. Raymundo got the rebar away from Jack and hit him with it several times, breaking his arm.. During this time, I was trying to break up the fight.

25. Raymundo denied that I ever hit Jack Lara Garey. Raymundo denied any discussion about a Cowboy's ring or Cardinals ring, or any theft of Jack's wallet. Raymundo stated that , as we were driving back to Sierra Vista, Jack started pounding on the seat and going crazy, saying "You f----d up my arm." In response, Raymundo turned and hit him a couple more times. When "WE" got back to the house at Sierra Vista, both Raymundo and I told Jack, "You'd better leave." Raymundo also testified that his girlfriend, Luz, my EX-sister-

in-law, had told him that Jack wouldn't leave her alone and kept bragging he wanted to have sex with her, that's why he was angry with Jack.

26. Jack's testimony was also disputed by an independent witness who coincidentally run into him in Tucson shortly before the trial commenced. "Michael Kibbler" testified that on August 5, 1997, he was looking for an apartment and saw Jack sitting on the back of a pickup smoking a marijuana joint. He went over to him and they smoked a joint together. Jack told him he is taking a guy to court and was also going to sue the City of Sierra Vista. He said he was going after my family because they owned a tire shop and had money, even though I did not have anything to do with it. He said that if he'd had a chance he'd also take my wife away. Jack told him that the co-defendant, Raymundo, had actually beaten him up, not me.

27. On 12-14-96 at approximately 1005 hrs detective Michael Brock interviewed Jack Lara Garey, at the hospital for almost one full hour. Present was detective Fuller and detective Jerry Lara, Jack's uncle. Their Police Reports were never disclosed in the instant matter.

Q1: Okay. I asked you before if you knew either one of these guys that you were with-

A1: uh-huh-

Q2: -could you give me any names that you remember?

A2: Raymundo's the driver, uh I guess-Rafael was a passenger.

Q3: Okay. Raymundo-is-

A3:-blonde haired dude-

Q4:is the driver-you said, little, big, tall, I don't know?

A4: -he's about five-five-eight-blonde hair, green eyes.

Q5: Okay.

A5: The other one is about five-eight, uh-it's got uh-a weird hairdo-black hair, got a-a-moustache, he had a funny tattoo-around his hand-that I recognized, it was uh-uh-a face of something, but it-I guess it was a-a ruined tattoo-and it was just a destroyed tattoo, but he left it like that, that's how I know him. [*RAYMUNDO*]

Q6: okay-uh-let's-is he also the one that hit you on the arm?

A6: Yeah-

Q7: -with the bar?

A7: -he's the-the passengers the same one that hit me on the arm and on the head-

Q8:-Could you go over again, who hit you where?

A8: Okay, Raymundo hit me-he hit me in the back and in the leg, and Rafael hit me in the head and the arm and in the back and then Raymu-uh Rafael was the one that kept pulling the knife out and stabbing me with it.

A5, A7 told DET. Brock the [*passenger*] was the black haired guy with a ruined tattoo [*RAYMUNDO*] he's the same one that hit him on the arm and on the head- kept poking him with a knife.

A8 [*PASSENGER*] hit him on the arm and on the head (same incident, two people described differently.)

Q9: I'm going to take you back there, now just a second. Okay, we're back on tape uh-when you were on the way to-

A9: -Sierra Vista-

Q10: -When you left Sierra Vista going to wherever you were going to have a couple of beers, what was the seating arrangement in the car?

A10: Raymundo was the driver. Rafael was the passenger, and I was riding in the back seat and rode for a good hour and a half, two hours, up by Tombstone, Naco, up there-Elfrida, and when we got out there, that's when everything started happening.

Q11: Uh-I'm going to go ahead and conclude this interview for now, the time is ten-thirteen a.m. END


28. FOLLOW UP INTERVIEW OF JACK LARA GAREY by detective Brock dated 12-16-96 (Monday Evening) at Jack's residence approx. 6:48 p.m.

29. Q12: Mr. Garey can you uh-I-I just showed you a photo line up, can you tell me whether or not you were able to identify anyone from that line up?

A12: Well-there was picture number four. *Morin

Q13: Okay, and you recognize that as whom?

A13: As the-the person who broke my arm and did the stabbing, and took my ring and money. [*ONE PERSON*]

30. Q14: Okay, did uh-when this happened were you alone at-just the two of you? [*only two fighting*]

A14: No, it was all three of us-

Q15: There was a third driver-okay-. During this assault you told me in our original interview that uh-you were in fear for your life.

31. Q15, detective Brock, changed subject by saying, there was a "3rd" driver-okay," and went on to say during this assault you told me in our original interview that uh-you were in fear for your life."

A15: Yes.

Q16: You want to go ahead and expand on that a little bit more again please?

A16: Well-they-they were planning on tying me to the back of their car and dragging me back to Sierra Vista and -I, they were trying to-I remember the guy-said-talking about-he be wishes that O got luck that I-that he didn't bring his gun with him, but that he wishes that he would have brought it because he wanted-he wanted to make sure I didn't get back into town (sic) goes onto to say he was fearing for his life.

Q17, Okay, when you got back to Sierra Vista, you got into your friendsa car?

32. A17: Into Lupe's car, and told me to get out of it-they picked up a couple of sticks or-what I saw was a baseball bat-and-something else, "I didn't really pay attention to the other one" (ME) and I was trying to get back into the house and tell the lady of the car that these guys ran me off, but they picked up that bat and whatever it was and came after me again, so I just ran in the car and took off, and I got here as far as Huachuca City.

33. A6, Jack Lara Garey, told detective Brock, they picked up a couple of sticks or-what I saw was a baseball bat-and-something else, "I didn't really pay attention to the other one" (sic), "so I just ran in the car and took off." [*only 1 bat*] He didn't really pay attention to

(me) the other guy because he knows that I never attacked him nor threatened him. He RAN jumped in car and took off which means he sustained NO INJURIES to the KNEES.

34. Q7: Okay, I'm going to back track a little bit, when you said, he said he wished he'd a brought his gun, which are you referring to-?

A7: Uh-in the line-up, picture #4 [*described Raymundo*]

Q8: Okay. I know we went over this Saturday when-when we talked once you were left with these guys from their house-

A8: Uh-huh-

Q9:-where were you going to go?

A9:-Uh we were going out to have some beers, and we did have beers and I thought everything was fine, (sic) they treated me with hospitality and stuff, and I thought everything was alright, (sic) and then he came back and he said, you want to go and have some more beers, let's go for a ride?

Q10: Which one left?

A10: -uh the driver-

See QA2, Rafael/PASSENGER [*backwards*]

Q11:-the other guy-the one-the other guy in the line-up.

A11: -he's not in the line-up..

Q12: Okay.

35. [*At this point, everything points at Raymundo as the passenger*]

36. A12: He invited me out for some more beers, invited me and the other guy, so of course, I didn't think nothing was wrong, so we got in the car and drove, (sic) out to the spot where they beat me up at (sic) goes on to say the muffler fell apart before getting to the house at the ranch.

Q13: And I believe you-

A13: I did believe I did see the house-from there-and they came out yelling, what's going on out here, and I couldn't remember very much after that because I was fearing for my life. [*Coached/selective memory*]

Q14: Okay. When-when you were at the house, you didn't ever actually get to that hous- did anyone say anyone's name there?

A14: Uh-huh (negative). Brock changed answer Uh-huh to reflect "no" when his answer was "yes."

Q15: No. And this was immediately before you were-beaten up?

A15: -yeah-

Q16: -or after you-

A16: After-after they beat me up, somebody came out yelling, what's going on out there and-the person I picked out in the line-up told her-uh-nothing-just don't worry about it, just go back in the house, we're leaving. [*ONE PERSON*]

37. Q17: Okay. Did anyone from the house actually come up to where you were at?

A17: No.

Q18: Okay.

A18: They didn't even see me- [*false/both eyewitnesses told detectives they saw entire fight unfold right in front of them*]

38. Q19: What is it a man or a woman who came out?

A19: It was a man and a woman-

Q20: -both?

A20: -they were both outside, I saw them standing outside, and-

Q21: Who-would-can you remember which one was doing the talking?

A21: The man was doing the talking.

Q22: Okay. Alright, so at-at this point, you'd already been beaten up by them-?

A22: (Yeah-and I was yelling), (sic) and, then started yelling back at me, and then that's when the people came out.

Q23: Okay, when-after the people came, that's when they decided okay we're not going to leave you there, or- [*coercion*]

A23: Yeah-we're not going to leave you, to what-you know-they were talking about, let's leave him here, but you know, the man say, I'm going to let the dog loose and-so then, they just said, get in the car we're going to take you somewhere else, (sic) get in the car, when I got in the car, that's when they, the person I picked out of the line-up, pulled out the knife and

Q24: As you were getting into the car-

A24: As I was getting into the car.

39. Q25: You told me before that you were sitting in the back seat-

A25: Yes sir.

Q26: Where at in the back seat?

A26: I was sitting in the-in back of the passenger which is the-the person in the line-up, uh-picture number four.

See A12: Well-there was picture number four. [*Morin/same incident*]

Q13: Okay, and you recognize that as whom?

A13: As the-the person who broke my arm and did the stabbing, and took my ring and money. [*ONE PERSON*]

40. Regarding Q2,A2,Q3,and Q4: detective Brock, asked if he was alone or only two of you? "No, three of us..." Obviously, aware it was only between them excluding me as participant. Plus, he never investigated a third driver.

41. After detective Brock discovered the fight was only between the two, he changed the subject to a 3rd driver in order to avoid his question from leading into a gray area that would open up a new can of worms.

42. Every time Jack Lara lied about something, detective Brock either 1), Changed the subject 2), interrupted him without allowing him to finish his answer 3), turned-off the recorder every time he was unhappy with his answers 4), Cohersed/Coerced him on what to say after he turned-off the tape recorder and 5), ended the interview without ever re-asking questions or clarifying previous inconsistent statements which cannot be deemed anything other than SOLICITATION, WITNESS TAMPERING and OBSTRUCTION OF JUSTICE.

43. During cross-examination Jack Lara Garey, after he was caught lying blatantly stated, "okay, he didn't stab me with a knife but that he was positive that both Raymundo and I, swung irons bars from each side of him and struck him across the knees with an iron bar." No photos taken of injuries to the knees. The medical testimony disclosed no injuries to the knees. The court reviewed no injuries to the knees. The police report failed to allege injuries to the knees with iron bars. Miraculuosly, he ran, jumped into car and took off.

44. A case stops at its first defect and/or at the first point fraud is found. Yet, the Cochise County Attorney's office relied on a fraudulent document known to be false and prosecuted the case with erroneous charges by detective Brock despite Vince Madrid's admission this was a fight between two, not three people.

JURY RACIALLY IMBALANCED FOR DISCRIMINATORY PURPOSES

45. FORMER COCHISE COUNTY PROSECUTOR CHRIS M ROLL, CROSSED OUT MINORITIES AND HISPANICS FROM BEING SELECTED AS JURORS IN HIS ERRONEOUS CASE AGAINST ME AND SELECTED A "WHITE" JUROR WHO WAS PRO POLICE and a LEGAL SECRETARY for TERAN S RUBEN a private law firm in Douglas, Arizona to decide my fate in the instant case for DISCRIMINATORY purposes.

46. FORMER COCHISE COUNTY PROSECUTOR CHRIS M. ROLL, on opening statement RELIED ON A FRAUDULENT DOCUMENT TO WRONGFULLY PROSECUTE THE CASE WITH ERRONEOUS CHARGES AND TOLD THE JURY THAT IRON BARS WERE FLYING FROM EVERYWHERE that never came into evidence.

47. FORMER COCHISE COUNTY DETECTIVE GREGORY FLOYD, tainted the case. Every time the Jury left for lunch or break, he would open the door for them to let them out from the deliberation room and put on a sick worried PUPPY face for them to see every time they walked passed him and had knowingly, intentionally, and recklessly tampered with the jury causing them to render an inconsistent verdict in contrary to the weight of evidence that was reached by "compromise" in order to make the state happy which cannot be deemed anything other than "Jury Tampering" and "Jury Misconduct." 1st day jury was laughing, next day crickets...afterwards, a female juror ran out of the courtroom crying!

48. FORMER COCHISE COUNTY PROSECUTOR CHRIS M. ROLL caused a mistrial of co-defendant's separate case and had knowingly, intentionally and recklessly destroyed exculpatory evidence, (Brady material) i.e., TRIAL TRANSCRIPTS of those proceedings for the unlawful purpose of winning an erroneous conviction.

49. FORMER COCHISE COUNTY PROSECUTOR CHRIS M. ROLL, violated his duty as a prosecutor to the public and the court, and his responsibilities as a professional. He was either oblivious to his obligations or intentionally disregarded them. His conduct caused potential injury, an erroneous conviction.

**50. FORMER COCHISE COUNTY PROSECUTOR CHRIS M. ROLL**, knowingly, intentionally and recklessly presented a fraudulent document as evidence to support his erroneous charges in the prosecution of the case falling straight into the category of prosecutorial misconduct.

**51.** On January 15, 2015 the plaintiff wrote to governor Doug Ducey, and reported the abuse of power by AZLEG and members of the Senate Judiciary Committee regarding the Erroneous Conviction Compensation Act HB2318 of 2005 during the 47th Legislation Session to present and the intent was established by proof that the Respondents/Defendants were Noticed and Warned of their wrongs and what was required to right them.

*****TO BE CONTINUED*****

By: _____
Rafael Moises Suarez

STATE OF ARIZONA   )
COUNTY OF PIMA    ) ss.
                   )

On this 23rd day of July, 2020 before me, Rafael Moises Suarez, the undersigned Notary Public in and for the State of Arizona, appeared Rafael Moises Suarez ( )personally known to me, ( )or proved to me on the basis of satisfactory evidence, to be the person whose name is subscribed within this instrument and acknowledged to me that he executed the same in his authorized capacity(ies), and that his signature on this instrument is true, correct and certain.

Witness my hand and official seal:

/s/ _____
SIGNATURE OF NOTARY PUBLIC

DENIA RABAGO
Notary Public, State of Arizona
Pima County
Commission # 543226
My Commission Expires
March 21, 2022